**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Louise Meyer, | No. CV-13-0871-TUC-BGM |
| Plaintiff, | |
| vs. | **ORDER** |
| Carolyn W. Colvin,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 13). Defendant filed her Response to Plaintiff's Opening Brief ("Response") (Doc. 15), and no reply was filed. Defendant also filed a Notice of Supplemental Authority (Doc. 16) to apprise the Court of recent decisions by the Ninth Circuit Court of Appeals relevant to this case. Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.    BACKGROUND**

   ***A.    Procedural History***

On September 21, 2010, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of June 1, 2010 due to osteoarthritis, severe back pain, hypertension, and left and right knee impairment. *See* Administrative Record

("AR") at 30, 54, 76, 77, 80, 85, 86, 90, 181, 188, 217, 220, 241.  Plaintiff's date last insured was September 30, 2011.  *Id.* at 45, 54, 77, 86, 217, 241, 299.  The Social Security Administration ("SSA") denied this application on November 23, 2010.  *Id.* at 30, 76-84, 101-4.  On December 27, 2010, Plaintiff filed a request for reconsideration, and on February 8, 2011, SSA denied Plaintiff's request.  *Id.* at 30, 85-94, 105-9.  On March 16, 2011, Plaintiff filed her request for hearing.  *Id.* at 30, 110-11.  On October 26, 2011, a hearing was held before Administrative Law Judge ("ALJ") Lauren R. Mathon.  AR at 30, 52-75.  On December 19, 2011, a supplemental hearing was held before ALJ Mathon.  *Id.* at 30, 43-51. The ALJ issued an unfavorable decision on January 26, 2012.  *Id.* at 27-36.  On August 29, 2012, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 11, 2013, review was denied.  *Id.* at 1-6, 299-305.  On August 9, 2013, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.   Factual History

Plaintiff was sixty-five (65) years old at the time of the initial administrative hearing, sixty-six (66) at the time of the supplemental hearing, and sixty-four (64) at the time of the alleged onset of her disability.  AR at 46, 57, 77, 86, 176, 181, 188, 217, 241, 257, 299.  On October 17, 2010, Plaintiff was awarded Social Security retirement benefits.  *Id.* at 55-56, 58, 97-100.  Plaintiff is a high school graduate.  *Id.* at 46, 58, 176, 221, 299.  Prior to her alleged disability, Plaintiff worked for an automobile dealership and prior to that as an accounting clerk for Bethlehem Steel.  *Id.* at 46-47, 61-64, 82-83, 93, 176, 195-216, 221, 226-28, 267-68, 299.  In 2010, Plaintiff briefly applied for and received unemployment benefits; however, she stopped looking for work due to her health concerns and as a result stopped receiving benefits.  *Id.* at 59-60, 272-98.

### 1.  Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she is approximately 5' 5" tall and 216 pounds.  AR at 57.  Plaintiff further testified that she lives with her husband, who is also retired.  *Id.* at 58.  Plaintiff also testified that she receives Social Security retirement benefits,

as well as a pension. *Id.* at 58-59.  Plaintiff testified that she drives a car, but has not taken any trips outside of the Tucson area since June of 2010. *Id.* at 60-61.

Plaintiff worked at Chapman Automotive from 2001 until 2010, and described her previous work as involving finalizing paperwork and other details related to car sales. *Id.* at 61.  Plaintiff estimated that she sat for approximately six (6) hours per day, with the remainder a combination of standing and walking.  AR at 61-62.  Plaintiff testified that monthly she would gather several files into a box and carry them to the storage area. *Id.* at 62-63.  Plaintiff estimated that each box was between twenty (20) and twenty-five (25) pounds. *Id.* at 63.  Plaintiff further testified that she had trouble lifting this amount, and sometimes co-workers would have to help her put the box on a chair to be pushed to the storage area. *Id.* at 65.  Plaintiff also testified that she was having trouble sitting for as long as necessary during the last few months of employment. *Id.* at 66.  Plaintiff testified that she was let go from Chapman Automotive, because she made a mistake resulting in an overpayment of commission.  AR at 66.  Prior to working at Chapman Automotive, Plaintiff testified that she was in an accounting position at Bethlehem Steel. *Id.* at 63.  She further testified that the work at Bethlehem Steel was similar to that which she had done at Chapman Automotive. *Id.* at 63-64.

Plaintiff testified that on November 25, 2009, she had a left knee replacement, and prior to that a bunionectomy. *Id.* at 64.  Plaintiff further testified that she had not had any further surgeries. *Id.*  Plaintiff testified that in June 2010, she was on medication for pain in her right knee.  AR at 68.  Plaintiff further testified that at that time a knee replacement for her right knee was suggested. *Id.*  Plaintiff also testified that her knees did not bother her sitting at work at that time, because she brought a stool and kept her knee up when she could. *Id.*  Plaintiff testified that after June 2010, her back pain became progressively worse. *Id.* at 66.  She began sitting down or reclining most of the time that she was home beginning in July 2010. *Id.* at 67.  Plaintiff testified that her knees do not bother her now unless her back pain travels down her leg.  AR at 69.  Plaintiff further testified that her back pain was "for

the most part" in her left leg, but that her right leg had been bothering her for "the last couple of days[.]" *Id.*

Plaintiff testified that she had not been back to see Dr. Sanon [sic] since June 2011, because he had told her that the shots would not cure her back problems, and she is afraid to have back surgery. *Id*. at 69-71. Plaintiff testified that Dr. Sanon [sic] thought that surgery would help her back pain; however, based on the experiences of people she knows outside of Tucson, she is concerned that back surgery will result in more problems. *Id.* at 71. Plaintiff further testified that her back pain has been progressive, starting just in her back, then through her buttock, and now down the side of her leg. *Id.* at 72. Plaintiff also testified that some days are better than others, and on bad days she needs to recline more. *Id.* Plaintiff testified that she has bad days three (3), four (4), or five (5) days per week, and that on those days it is difficult to bend over at the waist and she reclines more due to pain. AR at 73. Plaintiff further testified that she avoids stairs, because of both her back pain and her knees. *Id.* at 73-74. Plaintiff also testified that she is taking pain medication, meloxicam, for her right knee, and hoping that it will continue to be effective for awhile. *Id.* at 70, 74.

## 2.  Vocational Expert David Janus's Testimony

Mr. David Janus testified as a vocational expert at the supplemental administrative hearing. AR at 47. Mr. Janus described Plaintiff's past work as a title clerk, Dictionary of Occupational Titles ("DOT") code 205.582-066, as sedentary, semiskilled, with a Specific Vocational Preparation ("SVP") of 3. *Id*. at 47, 49. Mr. Janus further testified that based on the ALJ's description of her job duties, including lifting files to take them to the storage room, the job would extend to an administrative clerk, DOT code 219.362-010, which is light, semiskilled, with an SVP of 4. *Id.* at 47, 49. Mr. Janus described the accounting clerk position, DOT 216.482-010, as sedentary, semiskilled, with an SVP of 5. *Id.* at 47-49.

The ALJ asked Mr. Janus hypotheticals regarding an individual of the same age, education, and vocational background as the Plaintiff. *See id.* at 48-49. In the first hypothetical, the ALJ asked about someone limited to medium level work, who can "lift 50

1  pounds maximum, 20 pounds repetitively; [and] no restrictions on standing, sitting, walking,

2  bending or crouching." AR at 48.  Mr. Janus testified that such an individual would be able

3  to perform both jobs previously held by Plaintiff.  *Id.*  In the second hypothetical, the ALJ

4  altered it to be an individual limited to sedentary work.  *Id.*  Mr. Janus testified that such an

5  individual would be able to perform the duties of accounting clerk.  *Id.*  Finally, the ALJ

6  asked about an individual who, in an eight-hour work day, could sit for three (3) hours total

7  and stand and/or walk for one hour total.  *Id.*  Mr. Janus testified that such an individual

8  would not be able to perform the Plaintiff's prior jobs, because the individual could not work

9  full-time.  AR at 49.

10  In response to Plaintiff's counsel's hypothetical, Mr. Janus further testified that an

11  individual who missed three (3) days per month would not be able to sustain Plaintiff's past

12  relevant work.  *Id.*  Mr. Janus also testified that there would not be any work that such an

13  individual could sustain.  *Id.* at 49-50.  Mr. Janus confirmed that his testimony had been

14  consistent with the DOT and his personal experience.  *Id.* at 50.

15  ### 3. Plaintiff's Medical Records

16  On August 20, 2009, Plaintiff was seen by Murray F. Nance, P.A.–C.[1] as a new

17  patient regarding "a three week history of left knee pain."  AR at 309.  PA Nance reported

18  that Plaintiff was started on meloxicam by her primary care physician approximately three

19  weeks prior.  *Id.*  On exam, Plaintiff's left knee had "a 9 degree valgus deformity, 10 degree

20  flexion contrature[,]" and further flexes to 115 degrees, with the right knee very similar.  *Id.*

21  PA Nance injected Plaintiff's left knee with lidocaine, Marcaine, and DepoMedrol.  *Id.*

22  On November 13, 2009, Plaintiff followed up with Russell G. Cohen, M.D. regarding

23  her arthritic knee.  *Id.* at 310.  Dr. Cohen noted that the injection helped for a short time, but

24  her pain persisted.  AR at 310.  Dr. Cohen reported the same features of Plaintiff's knees as

25  PA Nance, and also noted good movement in her hips without discomfort.  *Id.*  Dr. Cohen

26  _____

27  [1]Supervised by Russell G. Cohen, M.D.

28

reviewed the x-rays ordered by PA Nance in August, and noted "severe degenerative arthritis with bone-on-bone lateral compartments of both knees." *Id.*  Dr. Cohen indicated knee replacement was his preferred treatment. *Id.*  On November 24, 2009, Plaintiff was seen by PA Nance for a pre-operative physical prior to her total left knee arthroplasty, scheduled for the following day. AR at 311, 318-19.  On November 25, 2009, Plaintiff underwent surgery for a total left knee replacement. *Id.* at 312, 316-17, 320.

On December 2, 2009, Plaintiff was seen by Venecia Rhodes, P.A.–C. for a follow-up regarding her left total knee arthroplasty. *Id.* at 330-31.  Plaintiff complained of urinary frequency since release from the hospital, but otherwise was noted to be healing well. *Id.* On December 10, 2009, Plaintiff was seen by PA Nance for a checkup two weeks post left knee replacement. *Id.* at 313.  PA Nance noted that Plaintiff was healing well, and was to continue therapy as prescribed. *Id.*

On January 7, 2010, Plaintiff was seen by Dr. Cohen for a follow-up of her left total knee replacement. *Id.* at 314.  Dr. Cohen noted that her knee was healing well, although Plaintiff continued to have issues with pain. *Id.*  Dr. Cohen further noted that Plaintiff complained of "some numbness and burning over the right thigh since she had the spinal done" just prior to surgery.  AR at 314.  Dr. Cohen referred Plaintiff to Dr. Goorman regarding the potential benefit of a nerve block. *Id.*

On April 8, 2010, Plaintiff was seen for another follow-up with Dr. Cohen. *Id.* at 315. Dr. Cohen noted that Plaintiff was mostly happy with the replacement, despite "a couple of episodes of discomfort." *Id.*  Plaintiff was instructed to continue taking the meloxicam. *Id.*

On July 15, 2010, Plaintiff was seen by Kimy Charani, D.O. complaining "of some numbness over the anterior lateral aspect of the right thigh with occasional radiation down the back of the right leg with sitting or standing too long."  AR at 328.  Dr. Charani noted that this began "shortly after [Plaintiff's] left knee replacement." *Id.* at 328-29.  Dr. Charani reported a negative straight leg raise test. *Id.* at 329.

On August 5, 2010, Plaintiff was seen by Venecia Rhodes, P.A.–C. due to lower back

pain and sciatic which was keeping her awake at night. AR at 326-27. Plaintiff indicated that she was taking meloxicam and had pain radiating from her gluteal region down the posterior aspect of both legs, and neuropathy over the right anterior thigh. *Id.* PA Rhodes gave samples of Soma and Flexeril for pain, as well as a referral to physical therapy. *Id.*

Pursuant to request by the Arizona Department of Economic Security ("AZDES"), Plaintiff was examined by Scott Krasner, M.D., who also completed a medical source statement. *Id.* at 333-42. Plaintiff saw Dr. Krasner on November 9, 2010. *Id.* at 333. Dr. Krasner noted upon examination that Plaintiff had "no palpable tenderness or muscle spasms in her back." AR at 334. Dr. Krasner further noted that Plaintiff's "shoulders and iliac crests are symmetric[,]" that "[s]he has full range of motion of her back and can forward flex 90 degrees backwards, extend 30 degrees, flex laterally 40 degrees in each direction[,]" without "pain with range of motion of her back." *Id.* Dr. Krasner also noted that Plaintiff was able to walk normally and do a deep-knee bend. *Id.* X-rays showed the left knee replacement, mild to moderate tricompartmental degenerative changes in the right knee, and "anterolisthesis of L4 relative to L5 with mild to moderate degenerative changes L3-4 through L5-S1[,]" as well as in the thoracolumbar junction. *Id.* at 334, 336-38, 342. Dr. Krasner expected the limitations he noted would continue for twelve (12) months and recommended no lifting over fifty (50) pounds maximum, or over twenty-five (25) pounds repetitively. AR at 335, 339-40. Dr. Krasner further indicated that Plaintiff was unrestricted regarding seeing, hearing, and speaking, as well as climbing–ramp/stairs/ladder/rope/scaffolds, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. *Id.* at 335, 339-40. Dr. Krasner also found no restrictions to Plaintiff working around heights, moving machinery, extremes in temperature, chemicals, dust, fumes or gases. *Id.* at 340.

On November 19, 2010, Plaintiff returned for a follow-up with Dr. Cohen. AR at 347. Dr. Cohen reported that Plaintiff's left knee was "coming along very well" without pain or discomfort. *Id.* Dr. Cohen further noted that Plaintiff's right knee bothers her at night, but

1   that her symptoms are well-controlled "[i]f she remains fairly consistent with the Mobic[2][.]"

2   *Id.*  Dr. Cohen also noted that Plaintiff "has some back issues and pain down the legs which

3   are stable and becoming more sporadic than constant." *Id.*  Dr. Cohen reported that X-rays

4   showed her left knee functioning well, but her right nee was showing "advanced

5   tricompartmental arthrosis with bone on bone and osteophytes throughout." *Id*.

6       On December 17, 2010, Plaintiff was seen by Dr. Charani regarding her back pain and

7   "to have paperwork filled out to receive Social Security Disability" due to the same.  AR at

8   352-54.  Plaintiff reported that she "has daily pain 6-7 hours of the day" and "burning

9   sensations down both legs at times." *Id.* at 352.  Dr. Charani reported normal gain and

10  "diffuse tenderness across the lumbar spine" without swelling. *Id.*  Dr. Charani further

11  reported a "mild positive bilateral straight-leg raising signs." *Id.*  Dr. Charani stated that

12  Plaintiff's "prognosis for recovery is poor and will exceed 12 months" and recommended that

13  Plaintiff "see a Spinal Specialist for evaluation and possible treatment options." *Id.* at 353.

14  On the same date, Dr. Charani filled out a Multiple Impairment Questionnaire diagnosing

15  Plaintiff with chronic low back pain with sciatica and chronic insomnia due to pain.  AR at

16  356.  Dr. Charani further indicated that Plaintiff's prognosis was "unknown – likely poor"

17  and reported Plaintiff had pain across her lumbar spine, a positive straight leg test, and

18  tingling in both legs. *Id.* at 356-57.  Dr. Charani indicated that Plaintiff's pain occurred every

19  two (2) hours and was precipitated by standing, walking, and stooping. *Id.* at 358.  Dr.

20  Charani estimated Plaintiff's level of pain as an eight (8) out of ten (10), with ten (10) being

21  the most severe pain, and her fatigue as a three (3) out of ten (10), again with ten (10) being

22  the most severe. *Id.*  Dr. Charani indicated that Plaintiff could sit for five (5) hours and stand

23  or walk for two (2) hours in an eight (8) hour work day. *Id.*  Dr. Charani reported Plaintiff

24  limited to lifting 0-5 pounds frequently, 5-10 pounds occasionally, but never anything

25

26      [2]Mobic is the tradename for the generic drug meloxicam. *See* United States Food and
Drug Administration Medication Guides, *available at:*

27  http://www.fda.gov/drugs/drugsafety/ucm085729.htm (last visited March 13, 2015).

28

heavier. AR at 359. Dr. Charani further reported Plaintiff limited to carrying 0-5 pounds frequently and 5-10 pounds occasionally, but never anything more. *Id.* Dr. Charani found Plaintiff not to be limited in repetitive reaching, handling, fingering, or lifting or in grasping, turning, twisting objects or using her fingers/hands for fine manipulations. *Id.* 359-60. Dr. Charani reported Plaintiff to have minimal limitation in using her arms for reaching, including overhead. *Id.* at 360. Dr. Charani indicated that Plaintiff's symptoms would likely increase in a competitive work environment, that her condition would "interfere with the ability to keep the neck in a constant position[,]" and that she could not "do a full time competitive job that requires that activity on a sustained basis." *Id.* at 360-61. Dr. Charani reported that Plaintiff's experience of "pain, fatigue[,] or other symptoms" would constantly interfere with her attention and concentration. AR at 361. Dr. Charani further reported that these impairments were expected to last at least twelve months. *Id.* Dr. Charani indicated that Plaintiff was not a malingerer and capable of tolerating moderate work stress. *Id.* Finally, Dr. Charani reported that Plaintiff's impairments did not result in "good days" and "bad days[,]" she is not prone to infections, and does not require a job that "permits ready access to a restroom[.]" *Id.* at 362.

On April 26, 2011, Plaintiff saw Dr. Cohen for a follow-up regarding her left total knee replacement. AR at 368. Plaintiff indicated discomfort on the medial side of her knee, which had resolved by the time of the appointment. *Id.* Additionally, Dr. Cohen noted that Plaintiff informed him that she had filed for disability because of her back, and he responded that he did not treat or examine backs, but offered "to fill out her forms for her knees which in [his] opinion do not leave her disabled." *Id.*

On May 13, 2011, Plaintiff underwent magnetic resonance imaging ("MRI") of her lumbar spine. AR at 367, 378-79, 383-84. The report indicates "Grade I anterolisthesis of L4 on L5 with severe canal stenosis . . . [and] [m]oderately severe right foraminal narrowing and severe left foraminal narrowing." *Id.* Degenerative changes of the facet joints and mild bilateral foraminal narrowing were noted at L5/S1. *Id.* Additionally, the report indicated

1   "degenerative changes of the lower thoracic spine" including loss of disc heights and

2   "degenerative changes of the endplates at T10/T11." *Id.*

3       On June 21, 2011, Plaintiff was seen by neurosurgeon Abhay Sanan, M.D. AR at 376,

4   380-81. Upon review of Plaintiff's May 13, 2011 MRI scan, Dr. Sanan reported neurogenic

5   claudication and mechanical back pain. *Id.* at 376, 380-81. Dr. Sanan noted that Plaintiff

6   "can currently walk or stand approximately five to ten minutes before she develops back pain

7   that then radiates down both legs." *Id.* at 380. Dr. Sanan stated that "[t]he culprit is the

8   grade I spondylolisthesis at L4-L5" which "is a degenerative slip." *Id.* at 376, 381. Dr.

9   Sanan reported reviewing treatment options with Plaintiff, including conservative, as well

10  as surgical options. *Id.* "The surgical option would be a decompression and arthrodesis."

11  *Id.* At the time of Plaintiff's visit with Dr. Sanan, she had not had any physical therapy or

12  steroid injections. *Id.* at 380.

13      On July 19, 2011, Dr. Charani wrote a letter reflecting her findings of the Medical

14  Impairment Questionnaire, with the exception that she reported Plaintiff experiencing "good

15  days" and "bad days." AR at 365. Dr. Charani further indicated that the letter was to

16  supplement her December 17, 2010 opinion, which she stated remained valid. *Id.*

17      On August 30, 2011, Dr. Charani filled out a Spinal Impairment Questionnaire

18  regarding Plaintiff. AR at 369-75. Dr. Charani indicated Plaintiff has chronic lower back

19  pain and right and left sciatica. *Id.* at 369. Dr. Charani reported that Plaintiff's prognosis is

20  poor and she has a limited lumbar range of motion, with pain, tenderness, muscle spasm,

21  decreased sensation, and muscle weakness across the lumbar spine. *Id.* at 369-70. Dr.

22  Charani further reported that Plaintiff has an abnormal gain, trigger points across the lumbar

23  spine, positive straight leg raising test, and decreased range of motion at the lumbar spine.

24  *Id.* at 370. Dr. Charani relied on the May 13, 2011 MRI findings and reported Plaintiff's

25  chronic, daily pain and numbness. *Id.* at 371. Dr. Charani reported that movement, bending,

26  stooping, squatting, and lifting all precipitate Plaintiff's pain, and indicated that Plaintiff has

27  difficulty sleeping. AR at 372. Dr. Charani found that Plaintiff can sit for three (3) hours

28

in an eight (8) hour work day and stand or walk for one (1) hour.  *Id.*  Dr. Charani also reported that Plaintiff could not sit continuously in a work setting, and would need to get up every thirty (30) minutes for ten (10) to fifteen (15) minutes.  *Id.*  Dr. Charani limited Plaintiff's lifting to 0-5 pounds frequently, 5-10 pounds occasionally, 10-20 pounds occasionally, and nothing greater than twenty (20) pounds.  *Id.*  Dr. Charani limited Plaintiff's carrying to 0-5 pounds frequently, 5-10 pounds frequently, 10-20 pounds occasionally, but nothing more.  AR at 373.  Dr. Charani indicated that Plaintiff was taking Hydrocodone in addition to Mobic, and had tried chiropractic and physical therapy, as well as a referral to a neurosurgeon.  *Id.*  Dr. Charani reported that Plaintiff's pain and other symptoms frequently interfered with her attention and concentration, and that these symptoms would last at least twelve (12) months.  *Id.*  Dr. Charani again found that Plaintiff was not a malingerer and capable of moderate work stress.  *Id.* at 374.  Dr. Charani indicated that Plaintiff would need to take unscheduled breaks at work every two (2) to three (3) hours, that she would not be able to keep her neck in a constant position, and would have "good days" and "bad days."  *Id.*  Dr. Charani further reported that Plaintiff would be absent from work more than three (3) times per month.  *Id.*  Finally, Dr. Charani reported that Plaintiff would be required to avoid pulling, kneeling, bending, and stooping.  AR at 375.  Ultimately, Dr. Charani opined that she did not believe Plaintiff could return to work in light of her chronic back pain.  *Id.*

On January 17, 2012, Plaintiff was seen by John P. Kelley, M.D., P.C.  AR at 16-18. On the same date, Dr. Kelley filled out a Spinal Impairment Questionnaire.  AR at 19-26. Dr. Kelley diagnosed Plaintiff with "lumbosacral osteoarthritis and degenerative joint disease, bilateral knee osteoarthritis with left total knee replacement, thoracic degenerative joint disease and osteoarthritis, obesity, chronic pain syndrome with insomnia, well-controlled hypertension, right lateral thigh numbness and paresthesias, either secondary to lumbar radiculopathy or lateral femoral cutaneous neuropathy[,] [and] . . . irritable bowel syndrome with diarrhea."  *Id.* at 16, 19.  Upon physical examination, Dr. Kelley noted that

1    Plaintiff "has an antalgic, limping gait due to arthralgia in the right knee[,]" as well as

2    swelling. *Id.* at 17, 20. Additionally, Dr. Kelley reported "flattening of the lumbar lordosis,

3    [and] possible mild thoracic kyphosis" with "cervical range of motion show[ing] 70 degrees

4    of bilateral rotation, 45 degrees of flexion/extension, 45 degrees of right lateral bending, and

5    30 degrees of left lateral bending." *Id.* at 17, 19. Dr. Kelley further reported "[t]horacic

6    rotation [as] 15 degrees bilaterally and . . . comfortable." *Id.* Plaintiff's lumbosacral range

7    of motion "shows 10 degrees of forward flexion, 70 degrees of flexion, 0 degrees of

8    extension, and 15 degrees of lateral bending[,]" and Plaintiff noted "minimal pain complaints

9    in performing these lumbar activities." *Id.* Dr. Kelley reported a negative straight leg raise

10   test, and "[n]o palpable trigger areas about the hips, iliac crest or lumbar paraspinal gluteal

11   musculature." *Id.* at 18. Dr. Kelley also noted tenderness bilaterally at Plaintiff's lower

12   paraspinal muscles. *Id.* at 20. Dr. Kelley relied on Plaintiff's May 13, 2011 MRI, as well

13   as her post-operative follow-ups for her left total knee replacement. AR at 21. Dr. Kelley

14   noted Plaintiff's low back pain, diffuse leg and bilateral knee pain, insomnia with chronic

15   plain and right anterior lateral thigh paresthesias as her primary symptoms. *Id.* Dr. Kelley

16   reported standing and walking stairs as precipitating factors to Plaintiff's pain. *Id.* at 22. Dr.

17   Kelley further reported that Plaintiff could sit for four (4) hours in an eight hour work day,

18   and stand or walk for one (1) hour. *Id.* Dr. Kelley further stated that Plaintiff could not sit

19   continuously in a work setting. *Id.* Dr. Kelley limited Plaintiff to lifting 0-5 pounds

20   frequently, 5-10 pounds occasionally, and never anything heavier. AR at 22. Dr. Kelley

21   similarly limited Plaintiff to carrying 0-5 pounds frequently, 5-10 pounds occasionally, and

22   never anything heavier. *Id.* at 23. Dr. Kelley found that Plaintiff's experience of pain and

23   other symptoms seldom interfered with her attention and concentration. *Id.* Dr. Kelley

24   expected that Plaintiff's symptoms would last longer than twelve (12) months and that she

25   is not a malingerer. *Id.* at 23-24. Dr. Kelley also indicated that Plaintiff would be able to

26   tolerate moderate work stress. *Id.* at 24. Dr. Kelley reported that Plaintiff would need to take

27   unscheduled rest breaks and would likely be absent from work more than three (3) times per

28

1   month. *Id.* Finally, Dr. Kelley indicated that Plaintiff should not push, pull, kneel, bend, or

2   stoop, and should avoid heights. *Id.* at 25.

3

4               **II.    STANDARD OF REVIEW**

5               The factual findings of the Commissioner shall be conclusive so long as they are

6   based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3);

7   *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

8   Commissioner's denial of disability insurance benefits when the ALJ's findings are based

9   on legal error or are not supported by substantial evidence in the record as a whole." *Tackett

10  v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v.

11  Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

12              Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

13  preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

14  873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

15  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

16  as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

17  Where "the evidence can support either outcome, the court may not substitute its judgment

18  for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

19  1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

20  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must

21  consider the entirety of the record weighing both evidence that supports as well as that which

22  detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

23

24  **III.   ANALYSIS**

25              The Commissioner follows a five-step sequential evaluation process to assess whether

26  a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows:

27  Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not

28                                  - 13 -

disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2011, and was not engaged in substantial gainful activity since June 1, 2010.  AR at 32.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: status post left knee replacement [and] degenerative disc disease (20 CFR 404.1520(c))."  *Id.*  At step three, the ALJ found that Plaintiff does "not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  *Id.*  At step four, the ALJ found that Plaintiff "had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)."  *Id.* at 33.  Accordingly, at step five, the ALJ found that "[t]hrough the date last insured, the claimant was capable of performing past relevant work as an accounting clerk[,] [because] [t]his work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)."  *Id.* at 35.  As such, the ALJ found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from June 1, 2010, the alleged onset date, through September 30, 2011, the date last insured (20 CFR 404.1520(f))."  AR at 35.  Plaintiff asserts that the ALJ erred in  1) failing to give proper wait to Plaintiff's treating physicians; 2) failing to properly evaluate Plaintiff's credibility; and 3) the Appeals Council

1    failed to consider additional medical evidence.  Pl.'s Opening Brief (Doc. 13) at 8-17.

2         ### A.    *Plaintiff's Credibility*

3         Plaintiff asserts that "[t]he ALJ erred by finding Ms. Meyer not credible based solely

4    on the 'objective medical evidence' . . . [and] applied the wrong legal standard in making her

5    credibility determination."  Pl.'s Opening Br. (Doc. 13) at 14.  The Commissioner argues that

6    "the ALJ's discussion was sufficiently specific to assure the Court that the ALJ did not

7    arbitrarily discredit Plaintiff's testimony."  Def.'s Response (Doc. 15) at 11.  The Court

8    disagrees with the Commissioner.

9         "To determine whether a claimant's testimony regarding subjective pain or symptoms

10   is credible, an ALJ must engage in a two-step analysis."  *Lingenfelter v. Astrue*, 204 F.3d

11   1028, 1035-36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective

12   symptoms 'must produce objective medical evidence of an underlying impairment which

13   could reasonably be expected to produce the pain or other symptoms alleged[.]'"  *Smolen v.*

14   *Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341,

15   344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763

16   F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that her impairment

17   could reasonably be expected to cause the severity of the symptom she has alleged; she need

18   only show that it could reasonably have caused some degree of the symptom."  *Smolen*, 80

19   F.3d at 1282 (citations omitted).  "Nor must a claimant produce 'objective medical evidence

20   of the pain or fatigue itself, or the severity thereof.'  *Garrison v. Colvin*, 759 F.3d 995, 1014

21   (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and

22   there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the

23   severity of her symptoms only by offering specific, clear and convincing reasons for doing

24   so.'"  *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v.*

25   *Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and

26   convincing" requirement had been excised by prior Ninth Circuit case law).  "This is not an

27   easy requirement to meet: 'The clear and convincing standard is the most demanding

28                                           - 15 -

1    required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r*

2    *of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

3            "Factors that an ALJ may consider in weighing a claimant's credibility include

4    reputation for truthfulness, inconsistencies in testimony or between testimony and conduct,

5    daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or

6    follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007)

7    (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at

8    1163.  The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs

9    must be especially cautious in concluding that daily activities are inconsistent with testimony

10   about pain, because impairments that would unquestionably preclude work and all the

11   pressures of a workplace environment will often be consistent with doing more than merely

12   resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted).  Furthermore, "[t]he

13   Social Security Act does not require that claimants be utterly incapacitated to be eligible for

14   benefits, and many home activities may not be easily transferable to a work environment

15   where it might be impossible to rest periodically or take medication."  *Smolen*, 80 F.3d at

16   1287 n. 7 (citations omitted).  The Ninth Circuit Court of Appeals recently noted:

> The critical differences between activities of daily living and activities in a
> full-time job are that a person has more flexibility in scheduling the former
> than the latter, can get help from other persons . . . , and is not held to a
> minimum standard of performance, as she would be by an employer.  The
> failure to recognize these differences is a recurrent, and deplorable, feature of
> opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012))

(alterations in original).  "While ALJs obviously must rely on examples to show why they

do not believe that a claimant is credible, the data points they choose must *in fact* constitute

examples of a broader development to satisfy the applicable 'clear and convincing'

standard."  *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).

"Although it is within the power of the Secretary to make findings concerning the credibility

of a witness and to weigh conflicting evidence, *Rhodes v. Schweiker*, 660 F.2d 722, 724 (9th

Cir.1981), [she] cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982)).

Here, in making her finding regarding Plaintiff's residual functional capacity, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

AR at 34. "The ALJ's decision then drifts into a discussion of the medical evidence; it provides no *reasons* for the credibility determination." *Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014). Toward the end of the opinion the ALJ further found that:

> The undersigned finds the claimant to be less than credible with respect to the extent to which her impairments preclude the performance of work-related activities. The undersigned first notes that the objective medical evidence of record indicate that the claimant remains highly functional. Given the lack of support for the claimant's allegations in the record, the undersigned finds her testimony to be less than credible.

AR at 35. "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)). "But the ALJ did not elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony." *Burrell*, 775 F.3d at 1138 (emphasis in original). The Ninth Circuit Court of Appeals has unequivocally stated that its "decisions make clear that we may not take a general finding – an unspecified conflict between Claimant's testimony about daily activities and her reports to doctors – and comb the administrative record to find specific conflicts." *Id.* As such, the ALJ's credibility determination cannot stand. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th

1   Cir. 1995)).  Upon remand, the ALJ shall follow the Ninth Circuit mandates in assessing
2   Plaintiff's credibility.

3          **B.**     ***Treating Physician Opinion***

4         Plaintiff asserts that "[t]he ALJ erred be rejecting the opinions from the treating
5   source[,]" Dr. Charani.  Pl.'s Opening Br. (Doc. 13) at 10.  The Commissioner argues that
6   "[t]he ALJ appropriately evaluated Dr. Charani's opinions."  Def.'s Response (Doc. 15) at
7   13.

8         "As a general rule, more weight should be given to the opinion of a treating source
9   than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821,
10  830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also*
11  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating physician
12  is given deference because 'he is employed to cure and has a greater opportunity to know and
13  observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th
14  Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations
15  omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is
16  contradicted by the opinions of other doctors, without providing 'specific and legitimate
17  reasons' supported by substantial evidence in the record."  *Rollins v. Massanari*, 261 F.3d
18  853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see*
19  *also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421
20  (9th Cir. 1988).  "The ALJ can meet this burden by setting out a detailed and thorough
21  summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and
22  making findings."  *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408
23  (9th Cir. 1986)).  Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ
24  must provide specific, legitimate reasons for rejecting it."  *Id.*  (citing *Cotton*, 799 F.2d at
25  1408).  Additionally, "[a] physician's opinion of disability 'premised to a large extent upon
26  the claimant's own account of his symptoms and limitations' may be disregarded where those
27  complaints have been 'properly discounted.'"  *Morgan*, 169 F.3d at 602 (quoting *Fair v.*

28

*Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).  "Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability."  *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

The ALJ gave great weight to examining physician Scott Krasner, M.D.'s opinion. AR at 34.  With respect to treating physician Kimy Charani, D.O.'s opinion, the ALJ stated:

> Little weight is given to the opinion of Kimy Charani, D.O., who opined that the claimant was disabled from working due to her impairments (Ex. 5F, 6F, 7F, 10F).  Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.  Whether or not an individual is disabled under the act is one of those findings.  Treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.  Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

AR at 34-35.  As an initial matter, the sections of the Code of Federal Regulations to which the ALJ cites relate to nonexamining source opinions.  Furthermore, "an ALJ may reject a treating physician's uncontradicted opinion on the ultimate issue of disability only with 'clear and convincing' reasons supported by substantial evidence in the record."  *Holohan v. Massanari*, 246 F.3d 1195, 1202-03 (9th Cir. 2001) (citations omitted); *see also Ghanim*, 763 F.3d at 1161.  "If the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide 'specific and legitimate' reasons in order to reject the treating physicians opinion."  *Holohan*, 246 F.3d at 1203 (citations omitted).  As such, although it is the Commissioner's sole responsibility to make a finding of disability under the Social Security Act, a treating physician may still opine regarding a claimant's ability to work, and that opinion is generally entitled to great weight.  *See* 20 CFR 1527(d) & 416.927(d); *Holohan*, 246 F.3d at 1202-03; *see also Ghanim*, 763 F.3d at 1161.

In rejecting Dr. Charani's opinion, the ALJ went on to state:

- 19 -

> Here, the undersigned finds that the opinion of Doctor Charani is not supported by the medical evidence of record as a whole and accordingly little weight is given to her opinion.  Specifically, the undersigned notes that the first time the claimant exhibited a positive straight leg test was in December of 2010, when it was also noted that the claimant was asking Doctor Charani to fill out her disability paperwork (Ex. 5F).  Prior to that the claimant had consistent negative straight leg tests and was reporting well-controlled symptoms.  The limitations set forth by Doctor Charani are not supported by the medical evidence of record but, instead, appear to be upon the claimant's self report.

AR at 35.  As discussed in Section III.A., *supra*, the ALJ committed legal error in finding Plaintiff not credible.  As such, this finding cannot support a rejection of Dr. Charani's opinion evidence.  *Cf. Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible").  Furthermore, "when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim*, 763 F.3d at 1162 (citation omitted).

The ALJ provided a detailed and thorough summary of the medical evidence; however, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn*, 495 F.3d at 632.  The ALJ notes the timing of Dr. Charani's finding that Plaintiff exhibited a straight leg test coinciding with Plaintiff's request for disability paperwork; however, because this reason also relates to Plaintiff's credibility it is not sufficient.  "The ALJ must do more than state conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctor's are correct." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citations omitted).  Furthermore, "[t]he ALJ is required to consider the factors set out in 20 CFR § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion." *Ghanim*, 763 F.3d at 1161; *Garrison*, 759 F.3d at 1012 n. 5.  The ALJ did not do so here, and as such, failed to set forth "specific and legitimate" reasons supported by "substantial evidence in the record" for her dismissal of Dr. Charani's opinions. *See, e.g., Rollins*, 261 F.3d at 856.

1

### C.    New Evidence

2      "When, as here, 'the Appeals council considers new evidence in deciding whether to

3   review a decision of the ALJ, that evidence becomes part of the administrative record, which

4   the district court must . . . consider when reviewing the Commissioner[ of Social Security]'s

5   final decision for substantial evidence.'" *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir.

6   2014) (quoting *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012)).

7   In light of this Court's finding that the ALJ committed legal error in her assessment of

8   Plaintiff's credibility and Dr. Charani's opinion testimony, the Court directs the ALJ to

9   reassess Plaintiff's medical records in their entirety.

10

### D.    Remand for Further Proceedings

11      "'[T]he decision whether to remand the case for additional evidence or simply to

12   award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763

13   (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for

14   further administrative proceedings is appropriate if enhancement of the record would be

15   useful." *Benecke*, 379 F.3d at 593 (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir.

16   2000)).  Conversely, remand for an award of benefits is appropriate where:

17           (1) the ALJ failed to provide legally sufficient reasons for rejecting the
18           evidence; (2) there are no outstanding issues that must be resolved before a
             determination of disability can be made; and (3) it is clear from the record that
             the ALJ would be required to find the claimant disabled were such evidence
19           credited.

20   *Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand

21   solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony

22   to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see*

23   *also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those requirements are met,

24   though we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775

25   F.3d 1133, 1141 (9th Cir. 2014).

26      Here, the ALJ committed legal error in finding Plaintiff not credible and rejecting

27   treating physician Dr. Charani's opinion evidence.  "Viewing the record as a whole [this

28

1   Court] conclude[s] that Claimant may be disabled.  But, because the record also contains

2   cause for serious doubt, [the Court] remand[s] . . . to the ALJ for further proceedings on an

3   open record." *Burrell*, 775 F.3d at 1142.  The Court expresses no view as to the appropriate

4   result on remand.

5

6   **V.      CONCLUSION**

7          In light of the foregoing, the Court REVERSES the ALJ's decision and the case is

8   REMANDED for further proceedings consistent with this decision, including additional

9   hearing testimony, if necessary.

10

11         Accordingly, IT IS HEREBY ORDERED that:

12         1)      Plaintiff's Opening Brief (Doc. 13) is GRANTED;

13         2)      The Commissioner's decision is REVERSED and REMANDED;

14         3)      Upon remand, the Appeals Council will remand the case back to an ALJ on an

15  open record.

16         4)      The Clerk of the Court shall enter judgment, and close its file in this matter.

17         DATED this 16th day of March, 2015.

18

19  _____

20                          Bruce G. Macdonald
                            United States Magistrate Judge

21

22

23

24

25

26

27

28
                                            - 22 -